IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

LEWIS MOBELY,

　　Defendant.

CRIMINAL CASE NO.
1:13-CR-218-CAP-LTW

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Pending before this Court is Defendant Lewis Mobely's Motion to Suppress In-Court Identifications Based on Suggestive Out-of-Court Identification Procedures by Government Witness, Motion to Suppress Evidence Resulting from Unlawful Search Warrants, Perfected Motion to Suppress In-Court Identifications Based on Suggestive Out-of-Court Identification Procedures, Supplement to Motion to Suppress Evidence Resulting from Unlawful Search Warrant, and Motion to Suppress Identification. Docket Entries [17, 18, 23, 46, 59, 61].   Also before the Court is the Government's Motion for Reconsideration and Clarification.  Docket Entry [46].  This Court convened a suppression hearing with respect to the above-listed Motions to Suppress Identifications on June 30, 2014, and completed the suppression hearing on August 7,

2014.  Docket Entries [50, 56].  Thereafter, Defendant submitted a post-hearing brief in support of his Motions to Suppress Identification.  Docket Entry [61].  The Government has filed a response in opposition to Defendant's motions.  Docket Entry [26, 62].

Having considered Defendant's motions and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's Motions to Suppress Identifications be **DENIED**.  Docket Entries [17, 23, 61]. Additionally, the parties are ordered to more fully brief Defendant's Motions to Suppress Evidence Resulting from Unlawful Search Warrants as indicated herein. Docket Entries [18, 59].

Also before the Court are Defendant's Motion for Additional Time to Perfect Motion to Suppress In-Court Identifications Based on Suggestive Out-of-Court Identification Procedures by Government Witness and Defendant's Motion for Additional Time to File Reply Brief.  Docket Entries [22, 63].  In Defendant's Motion for Additional Time to Perfect Motion to Suppress In-Court Identifications Based on Suggestive Out-of-Court Identification Procedures by Government Witness, Defendant seeks an additional two weeks to perfect his Motion to Suppress In-Court Identifications.  Similarly, in Defendant's Motion for Additional Time to File Reply Brief, Defendant seeks an additional week to file Defendant's Reply in support of his

2

Motion to Suppress Identification.   For good cause shown, both Motions are **GRANTED** Nunc Pro Tunc.  Docket Entries [22, 63].  The Government's Motion for Reconsideration and Clarification is **DEEMED MOOT**.  Docket Entry [46].

## DEFENDANT'S MOTIONS TO SUPPRESS IDENTIFICATION EVIDENCE

On July 14, 2009, the Grand Jury entered a two count indictment against Defendant Lewis Mobely (hereinafter "Defendant") for possession of a firearm and ammunition after having been convicted of a felony in violation of 18 U.S.C. §§ 922(g)(1), 924(e).  In Defendant's various motions to suppress identification evidence (Docket Entries 17, 23, 61), Defendant contends that the Government should not be permitted to offer in-court identification testimony by a witness who claims that Defendant shot him because the Government previously used unduly suggestive procedures in procuring the witness' identification of Defendant from a photo array and because the witness' identification of Defendant was unreliable.

## I.   Background Facts Concerning the Witness' Identifications

On February 16, 2013, a shooting occurred in Northwest Atlanta. (Tr. of June 30, 2014 Hrg., Doc. 50, hereinafter "Tr.," 10).  Allegedly, the shooting occurred after the shooting victim said "Blatt," meaning "blood love all the time," to a man standing outside a store, who investigating officers now believe is a member of the Gangster

3

Disciples gang.  (Tr. 10-12, 42; Tr. of Aug. 7, 2014 Hrg., Doc. 56, hereinafter "Tr2,"

182).  "Blatt" is considered a disrespectful term when uttered to a member of the

Gangster Disciples gang.  (Tr. 10-12, 42; Tr2 182).  Video surveillance of the shooting

suggests that the man who was outside the store, believed to be the Defendant in this

case, entered the store, had a discussion with the victim inside the store, and shot the

victim multiple times.  (Tr.  23-25).

On February 18, 2013, Investigator Pierre Joseph of the Atlanta Police

Department visited the victim of the shooting in the hospital.  (Tr. 10-12, 42; Tr2 182).

Investigator Joseph believes that during his conversation with the victim, Investigator

Joseph revealed that he had viewed video surveillance footage which  captured the

shooting.  (Tr. 74).  Investigator Joseph also believes that he told the victim that the

person who shot the victim had a "GD" or "Gangster Desciple" jacket.  (Tr. 74; Gov't's

Ex. 2).  According to Investigator Joseph, as a result, he probably asked the victim about

his own gang affiliation.  (Tr. 74).

Investigator Joseph later created a six-person photograph array to present to the

victim of the shooting for purposes of the victim's identification of his shooter.  (Tr. 17).

Investigator Joseph utilized the Police Central Database, which compiles book-in

photos, and searched for book-in photos of other individuals who were the same race

and within two years of the age of the suspected shooter. (Tr. 18). Investigator Joseph's goal was to make all of the individuals depicted in the photos "look the same" so that the photo array would not be suggestive. (Tr. 51). Investigator Joseph also attempted to make the pictures look like they had similar backgrounds and included just the headshots of each person in the photo array. (Tr. 29, 32). No clothing other than the collars of the subjects were viewable in the photo array, and none of the subjects in the photo array were wearing a jacket. (Tr. 106). Because Investigator Joseph was concerned that Defendant's facial tattoo would stand out amongst the pictures, he made the pictures darker to try to obscure Defendant's tattoo. (Tr. 32, 68). Investigator Joseph placed Defendant's picture in position number 5 of the photo array. (Tr. 30; Gov't's Ex. 1A).

On February 20, 2013, Investigator Joseph and Investigator Michael Young went to the hospital to present the photo array to the victim, who was in his hospital bed. (Tr. 33-34; Tr2 202). Investigators Joseph and Young made an audio recording of their conversation with the victim. (Tr. 36-37; Gov't's Ex. 2). At the beginning of the interview, the victim states on the recording that on February 16th, he was walking at 500 James P. Drive and said "blatt" to an individual who subsequently shot him three times. The victim said that he saw the shooter when he walked in the store and when

5

the shooter was shooting him.  The victim states that he thinks that he saw the shooter's face clearly that day and that it was two or three in the afternoon.  (Tr. 48; Gov't's Ex. 2).  The victim described Defendant as being tall, black or brown, having a little cross under the eye, and a braid that "looked like dreads."  (Tr. 40; Gov't's Ex. 2).  According to Investigator Joseph, Defendant does not have a tattoo of a cross on his face.  (Tr. 106).  The victim further stated that the shooter was wearing all black, but in the video surveillance footage of the shooting, the shooter appeared to be wearing blue jeans and a black and grey jacket.  (Tr. 81-82, 97, 103; Gov't's Exs. 2, 4).  Additionally, the victim stated that the shooter was wearing a hat and hoodie, but in the video surveillance footage, the shooter did not appear to be wearing a hat.  (Tr. 82-83; Gov't's Exs. 2, 4).  Investigator Joseph agrees that based on the video footage, the victim was able to look at his assailant at least sixteen seconds and possibly up to sixty-four seconds.  (Tr. 99, 102, 111).

Prior to presenting the photo array to the victim, Investigator Joseph read an admonition to the victim about viewing the photo array.  (Tr. 35; Gov't's Ex. 1B).  The admonition specified:

> I am about to show you a group of photographs to see if you can make an identification of the person who committed the crime now being investigated.  This group of photographs may or may not include a

6

photograph of the person who committed the crime.

You should only make an identification if you can do so.  You may not talk to anyone while viewing the photographs.

Since hair styles, beards and mustaches are easily changed, the photographs you are viewing may or may not depict the hairstyle or the facial hair similar to that of the person who committed the crime.  Also, note that photographs do not always depict the true complexion of a person; it may be lighter or darker than shown.  Pay no attention to markings or numbers appearing in any particular photograph.

Do not discuss with other witnesses whether or not you have selected a photograph during this showing.

(Tr. 36; Gov't's Exs. 1B, 2).  Investigator Joseph credibly testified that he did not tell the victim that he had a suspect in mind or that the suspect was in the photo array, did not tell the victim to point to any particular person, and ensured that the victim's mother held the photo array in a way in which the victim could see it.  (Tr. 34-35, 105; Tr2 205-06).  Likewise, Investigator Young credibly testified that the victim was read the admonition, and that neither he nor Investigator Joseph indicated to the victim who shot him, designated who the victim should choose from the photo array, and nor told the victim anything that would direct him who to choose from the array.  (Tr. 205, 208).  The victim's mother also credibly testified that the investigators did not suggest to the victim that the person who shot him was in the photo lineup.  (Tr. 131).

According to Investigator Joseph, when he presented the photo array to the victim, the victim attempted to raise his hand up but Investigator Joseph "could tell he was in pain based on his face, making faces." (Tr. 33). As a result, the victim's mother, who was also present, held the pictures up for the victim. (Tr. 33-34, 125).

Investigator Young told the victim to let him know whether he saw anyone who was familiar. Moments later, the victim stated that he thought "it [was] between 5, 6, and 3." (Tr. 49; Gov't's Ex. 2). One of the investigators then instructed the victim as follows: "Look at all those guys that you just picked out and try to narrow it down . . . just remember that day . . . remember his face. (Tr. 50, 52; Gov't's Ex. 2) The victim then immediately identified photograph number five. (Tr. 50, 52; Gov't's Ex. 2). The Investigator asked the victim how sure he was. (Gov't's Ex. 2). The victim responded, "It looked like it there," but also indicated that the individuals within the pictures "all look alike." (Gov't's Ex. 2). When the investigator asked the victim if he could write, the victim stated, "I don't want to write." (Tr. 52, 86; Gov't's Ex. 2). The investigator then instructed the victim's mother to circle photo number five and initial the photo. (Gov't's Ex. 2). Investigator Joseph testified that the investigators instructed the victim's mother to circle the individual the victim identified and to initial the photo array instead of having the victim do so because of their belief that the victim was in

pain.  (Tr. 34, 36; Tr. 206).

The victim's mother credibly testified that she circled and signed photo number five because the victim selected photo number five.  (Tr. 126).  The victim's mother credibly testified that neither she nor the investigators pointed out any of the photographs for the victim to select and that no one told the victim to select photo number five.  (Tr. 126).  The victim's mother further testified that the victim could use his hand to point at the photo array and that he did not appear to be suffering pain in his arm.  (Tr. 129).  According to the victim's mother, the victim could have circled photo number five himself.  (Tr. 129).

The investigators asked the victim how sure on a scale of one to ten the victim was about his identification, and the victim indicated that "it look like him there." (Gov't's Ex. 2).  When asked whether he was 100% sure, the victim repeatedly indicated, "that['s] him."  (Tr. 38; Gov't's Ex. 2).  Investigator Joseph testified that when the victim did so, he looked like he was about to "go into shock or something" and had "a stare in his eyes."  (Tr. 52-53).

The victim's version of events differed.  In contradiction to the victim's statements on the audio tape on February 20, 2013, the victim testified that he does not remember walking into the retail store where he was shot, he does not remember what

9

the person who shot him looked like, and he remembers waking up in the hospital. (Tr2 183-84). The victim subsequently testified, however, that he was grabbed from behind and remembers that the person who shot him was black. (Tr2 200). The victim testified that the investigators, prior to showing him the lineup, told him that the suspect was a member of the Gangster Disciples, they knew who the shooter was, and that his photograph was in the photo lineup. (Tr2 198). According to the victim, the investigators showed him the photo lineup during their first visit to the hospital, and when they showed him the photo lineup, it occurred as follows:

> I was in bed, and he walked in the room and we talked. He pointed at the third picture. I pointed the one of the picture right there, and this over here. He went unh-unh. Then we went to the next picture, can you I.D. him. I went unh-unh. He went to a third picture right there. Man be pointing at the picture.

(Tr2 185). The victim further stated that he initially pointed to the first photo in the lineup because he "guessed he thought it was [the shooter]," but "the officer said unh-unh." (Tr2 192, 195-96). The victim does not recall which officer said "unh-unh," and he does not remember the officers who visited him in his hospital room. (Tr2 191, 193). The victim claims that he never pointed to photo number five, and instead, one investigator's hands stopped at number five. (Tr2 196). The victim stated that he does not recall whether his mother signed photograph number five on his behalf, but admits

10

that the signature on the photo lineup was his mother's. (Tr2 191, 197).  The victim does recall telling his mother that he did not want to testify about two weeks prior to the Court's hearing.  (Tr2 193).

The victim further testified that prior to the Court's first hearing addressing Defendant's Motion to Suppress the Identifications, he was transported to Court on the same bus with Defendant and shared a cell with Defendant in the U.S. Marshal's lockup area before the hearing.  (Tr2 186-87).  The victim states, however, that Defendant did not speak to him or ask him to say or do anything in connection with his testimony. (Tr2 187).

## II.   <u>Legal Analysis</u>

In Defendant's various motions to suppress identification evidence (Docket Entries 17, 23, 61), Defendant contends that the Government should not be permitted to offer in-court identification testimony by the victim because the Government used unduly suggestive procedures in procuring the victim's identification of Defendant from a photo array.  In support, Defendant argues that the identification procedures were suggestive because the victim testified under oath that the police showed him whose photo to select.  Defendant further argues the police were unduly suggestive when, after the victim narrowed the lineup down to three people and said that all of the individuals

in the photographic lineup looked alike, the police told the victim to think back to the shooting, thereby suggesting that the suspect was within the remaining three photos. Defendant contends that the fact that the police told the victim that the suspect was a gang member and that they found his Gangster Disciple jacket when they arrested him increases the chances of misidentification.  Defendant also presents evidence from an eyewitness identification expert who opines that the victim's identification responses and his expression of confidence in his identification were coerced and are meaningless.[1]  Defendant also argues the victim's identification is unreliable because Defendant had facial tattoos, but given that the photos within the array were of such poor quality, the victim would not be able to tell whether Defendant or any of the other individuals within the array had facial tattoos.  Additionally, Defendant contends that the pictures could not provide for a reliable identification because they cut off the top's of the heads the individuals and were so dark that the pictures omit information that ordinary people utilize to form memory about a face.  Defendant argues the victim's

---

[1]  This Court has already concluded and still concludes, after considering the proffered testimony from the identification expert, that the identification expert's testimony would not be helpful in resolving the issues raised by this motion.  (Tr. 122); See United States v. Smith, 122 F.3d 1355, 1357-58 (11th Cir. 1997) (noting that the Eleventh Circuit has consistently looked unfavorably upon expert testimony regarding eyewitness reliability).

12

testimony shows that his identification was unreliable given that when he was asked how sure he was in his identification, the victim responded, "it look like his hair, but all of them look alike."  Lastly, Defendant argues that the victim, who stated that he was attacked from behind, could not and did not provide a reliable description of the person who shot him, and indicated that he did not want to identify the shooter in writing.

In Foster v. California, 394 U.S. 440 (1969), the Supreme Court recognized that, under a totality of the circumstances standard, the conduct of identification procedures may be "so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law."  Id. at 442 (internal quotation marks omitted); see also Simmons v. United States, 390 U.S. 377, 384 (1968) (holding that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification").  The linchpin in determining the admissibility of identification evidence is reliability.  Manson v. Brathwaite, 432 U.S. 98, 114 (1977).  "It is the likelihood of misidentification which violates a defendant's right to due process."  Neil v. Biggers, 409 U.S. 188, 198 (1973).  A two step analysis is used to determine whether

the admission of an out-of-court identification violates due process.  Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988); see also United States v. Walls, 297 F. App'x 599, 600-01 (11th Cir. 2007).  First, a court must determine if the original identification procedures were unduly suggestive.  Cikora, 840 F.2d at 895.  If the Court determines that the procedures were unduly suggestive, then a court must consider whether, under the totality of circumstances, the identification was nonetheless reliable.  Cikora, 840 F.2d at 895; United States v. Felix, No. 14-10925, — F. App'x —, 2014 WL 6462981, at *2 (11th Cir. Nov. 19, 2014).  The Court need not reach the question of whether the identification by the victim was reliable unless it first finds that the procedures arranged by law enforcement were unduly suggestive.  United States v. Whatley, 719 F.3d 1206, 1216 (11th Cir. 2013).  Thus, in order to warrant exclusion of identification evidence, the Defendant must convince the Court that both the lineup procedure was unduly suggestive and that the identification was not reliable.  United States v. King, 751 F.3d 1268, 1277 (11th Cir. 2014).

Defendant contends that the procedures in this case were unduly suggestive because  (1) the victim told the investigators that the person who shot him had a tattoo on his face, but other individuals within the lineup did not have any facial tattoos; (2) the victim was pressured to select a photograph when he was unsure; (3) the

14

investigators previously told the victim that the suspect wore a Gangster Disciples jacket, that the authorities had located the suspect, and that the suspect was in the photo lineup; (4) the investigators instructed the victim who to select; (5) the investigators effectively reduced the six person lineup to a three person lineup by having the victim select from three instead of six and by telling him to think back to the shooting; (6) Investigator Joseph darkened the photos thereby obscuring detailed information about the subjects' faces and cut off the tops of the heads of the subjects.

This Court concludes that the procedures in this case were not unduly suggestive. Factors considered in determining whether a photo array is unduly suggestive include the size of the array, the manner of its presentation, and details of the photographs themselves. United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994); United States v. Rosa, 11 F.3d 315, 330 (2d Cir. 1993). If there is nothing inherently prejudicial about the presentation, such as the use of a very small number of photographs or the use of suggestive comments, the "principal question is whether the picture of the accused, matching descriptions given by the victim, so stood out from all of the other photographs as to suggest to an identifying victim that [the accused] was more likely to be the culprit." Rosa, 11 F.3d at 330.

In this case, nothing about the size of the array, the manner of its presentation, or

15

the details of Defendant's photograph made Defendant's photograph stand out.  First, the size of the array, which included six pictures, militates in favor of a finding that the photo array was not unduly suggestive.  <u>See, e.g.</u>, <u>Sanchez</u>, 24 F.3d at 1263 (six photograph array not unconstitutionally small); <u>Rosa</u>, 11 F.3d at 330 (six photographs not impermissibly small); <u>United States v. Cary</u>, No. 1:07-cr-74-WSD, 2008 WL 80650, at *20 (N.D. Ga. Jan. 4, 2008).

Furthermore, the manner in which the investigators presented the photo array was not unduly suggestive.  The fact that one of the investigators instructed the victim to "look at all those guys you just picked out and try to narrow it down" and to "remember his face" did not render the photographic lineup unduly suggestive. First, the investigator's statements did not indicate to the victim which photograph to choose. Second,  even if the victim could have inferred based on the investigator's instructions that the shooter was depicted in the lineup despite the investigator's verbal admonition to the contrary, the mere fact that the witness knows that the suspect is depicted in the lineup does not render the lineup unduly suggestive where the law enforcement officer does not direct the witness to the picture of the suspect.  <u>United States v. Chance</u>, 277 F. App'x 941, 945-46 (11th Cir. 2008) (holding that detective's remark that subject had been captured was not suggestive because detective did not identify the suspect or which

individual in the photo array had been arrested); Cikora, 840 F.2d at 896-97 (concluding that lineup was not unduly suggestive even though law enforcement officer told witness that one of the individuals pictured was the suspect); United States v. Espinoza, No. 1:10-CR-0086-12-RWS-ECS, 2012 WL 7993620, at *4 (N.D. Ga. May 8, 2012) (similarly concluding that the fact that the detective told the victim that he might have a possible photograph of the shooter did not render the lineup impermissibly suggestive); United States v. Cary, No. 1:07-cr-74-WSD, 2008 WL 80650, at *20 (N.D. Ga. Jan. 4, 2008).  Furthermore, this Court disagrees with Defendant's analysis that merely suggesting to the victim that he should remember the day of the shooting and to further narrow down the photographs placed undue pressure on the victim to select a photograph or even indicated to the victim that the shooter was among the three.  The Investigator did not use a forceful tone when suggesting that the victim should consider the photographs further.

Moreover, this Court finds the victim's testimony that the investigators indicated to him which photograph to choose was not credible.  The details of the victim's testimony in this regard is inconsistent with the credible testimony of the victim's mother, Investigator Joseph, and the audio recording of the victim's interaction with the officers on the day the victim viewed the photo lineup.  First, consistent with the audio

17

recording of the incident and the testimony of the victim's own mother, Investigator Joseph credibly testified that he did not tell the victim to point to any particular person, did not indicate to the victim who shot him, or do anything that would direct him who to choose from the array, and actually allowed the victim's mother to hold the photo array. (Tr. 33-36, 105, 125-26; Tr2 205-06). Instead, the investigators read their admonition that they would show the victim a photo of a group of individuals to see if he could make an identification of the person who committed the crime and that he should make an identification only if he could do so. (Tr. 36; Gov't Ex. 1B, 2). The investigators then merely instructed the victim to let them know if anyone within the lineup was familiar while the victim's mother held the photo array. (Ex. 2). Thus, this Court concludes that the procedures used in showing the photo array to the victim were not suggestive. See, e.g., United States v. Knight, 382 F. App'x 905, 907 (11th Cir. 2010) (concluding that procedure was not unduly suggestive where law enforcement simply asked the witness to identify any individual he recognized from the array and to explain in what event in his life that person was associated).

Defendant further attempts to cast doubt on the procedures used by contending that it was suspect that the victim's mother circled Defendant on the photo array and initialed the photograph of Defendant. Notably, Defendant also points out that the

18

testimony of the victim's mother, who stated that the victim was able to circle and sign the photograph on his own, was contrary to Investigator Joseph's testimony. This Court, however, does not find this discrepancy in the testimony to be as significant as Defendant argues. While it is true that Investigator Joseph and the victim's mother's testimony was somewhat inconsistent on this point, this Court concludes that the victim's reluctance to sign and date the photograph and his mother doing so in his place is not evidence that the victim did not make the identification, but more likely explained by the victim's reticence in making an identification due to his fear of the shooter. It is likely that the Investigator, as he testified, interpreted such reluctance as resulting from the victim's pain, while the victim's mother did not. Even the victim's mother, however, admits that the victim appeared to be in pain in his legs and stomach. (Tr. 129). At most, this Court finds that the discrepancy between Investigator Joseph's and the victim's mother's recollection on this point is simply that they recalled the circumstances differently or interpreted the victim's reactions differently. Either way, this Court is unpersuaded by Defendant's argument and finds that both Investigator Joseph and the victim's mother credibly testified.

Finally, this Court cannot conclude that the details of the pictures within the photo lineup were suggestive. The Eleventh Circuit has held that if the subjects in a lineup

19

have "substantial similarity in facial features, complexion, facial hair, and general body type and appearance," the lineup is not unduly suggestive.  United States v. Smith, 148 F. App'x 867, 874-75 (11th Cir. 2005) (per curiam).  If, as in the instant case, there is nothing inherently prejudicial about the photo lineup presentation, such as the use of a very small number of photographs or the use of suggestive comments, the "principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit."  Rosa, 11 F.3d at 330.

In this case, the victim's photo did not standout to suggest that Defendant was more likely to be the culprit.  This Court notes that each of the men depicted in the photographs were oriented with their face forward in the center of the picture, shown from the neck upwards, and the amount of contrast within the photos were approximately the same.  Additionally each of the six African-American men within the photo lineup share some similar facial features.  Moreover, Defendant's arguments that the lineups were suggestive because the victim told the investigators that the person who shot him had a tattoo on his face, but the faces included within the lineup were too darkened to reveal any such facial tattoos is not persuasive.  By darkening the photos and obscuring the presence of facial tattoos, Investigator Young prevented Defendant's

photograph from standing out.  In addition, the Court notes that on the audio recording, the victim indicated that the individuals within the pictures "all look alike."  (Gov't's Ex. 2).  Thus, under these circumstances, this Court concludes that nothing within the actual pictures included within the lineup were suggestive.  Because the lineup was not suggestive, it did not violate Defendant's right to due process.  King, 751 F.3d at 1277; Whatley, 719 F.3d at 1216 (noting that the Court need not reach the question of whether the identification by the witness was reliable unless it first finds that the procedures arranged by law enforcement were unduly suggestive).  Therefore, Defendant's Motions to Suppress Identification should be **DENIED**.  Docket Entries [17, 23, 61].

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE RESULTING FROM UNLAWFUL SEARCH WARRANTS

In Defendant's Motion to Suppress Evidence Resulting from Unlawful Search Warrants, Defendant contends that the Court should suppress all evidence yielded from the search of 2771 White Oak Drive because there was no probable cause to support the search.  Docket Entries [18, 59].  In support, Defendant contends that because the victim's identification of him served as part of the factual basis for the search warrant and because Defendant's identification should be suppressed, the identification information must be excised from the warrant application and affidavit and cannot serve

21

as a factual basis supporting probable cause for the search warrant.   (Docket Entry 18, p. 2).  Defendant also argues that once the identification information is excised, the remaining allegations within the warrant affidavit do not provide probable cause.  As discussed above, however, this Court disagrees with Defendant that the identification evidence should be suppressed.  Thus, Defendant's argument that discussion of the identification of the shooter from the warrant application and affidavit should be excised fails and does not provide a basis for the Court to suppress items seized while executing the search warrant.

Defendant further contends that there was no probable cause because Defendant failed to establish a nexus between Defendant's alleged criminal activity and the residence located at 2771 White Oak Drive, and in fact, failed to assert any facts that show a connection between Defendant and 2771 White Oak Drive.  Before Defendant may challenge the existence of probable cause for the search of the residence located at 2771 White Oak Drive, however, Defendant has the burden of establishing that he has standing to challenge the search.  The Fourth Amendment protects persons against unreasonable searches of their persons and houses and thus, bestows personal rights which must be invoked by an individual.  U.S. CONST. amend. IV; Minnesota v. Carter, 525 U.S. 83, 88 (1998); Katz v. United States, 389 U.S. 347, 351 (1967) (explaining that

"the Fourth Amendment protects people, not places").  "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Katz, 389 U.S. at 351; Carter, 525 U.S. at 88; see also United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1990).  More precisely, a defendant must demonstrate both a subjective and an objective expectation of privacy in the area searched to establish standing to challenge the search.  United States v. Segura-Baltazar, 448 F.3d 1281, 1286 (11th Cir. 2006).  "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the [privacy] expectation be one that society is prepared to recognize as reasonable." United States v. Robinson, 62 F.3d 1325, 1328 (11th Cir. 1995) (citations and quotations marks omitted).  Moreover, Defendant cannot rely on the Government's position, contention, or theory to establish standing and must instead prove his expectation of privacy as to a particular place.  United States v. Thompson, 171 F. App'x 823, 828 (11th Cir. 2006) (a disclaimer of ownership of interest deprives a defendant of the subjective expectation of privacy necessary to establish standing); United States v. Sweeting, 933 F.2d 962, 964 & n.2 (11th Cir. 1991) (concluding that defendants who denied any relationship with their mother's residence except access did not have standing to object to the search,

23

despite fact that government established at trial that defendants actually lived at the residence); United States v. Bushay, 859 F. Supp. 2d 1335, 1348-49 (N.D. Ga. 2012); United States v. Chaidez-Ontiveros, No. 1:11-CR-0264-AT-JFK, 2011 WL 7574634, at *6 (N.D. Ga. Oct. 25, 2011).  Accordingly, to the extent that Defendant desires further consideration of the instant motion, Defendant is **ORDERED** to file a brief establishing his standing to contest the search of 2771 White Oak Drive by January 15, 2015.  This Court also observes that the Government has not filed a brief in opposition to Defendant's Motion to Suppress Evidence Resulting from Unlawful Search Warrants. The Government is therefore **ORDERED** to respond to Defendant's brief addressing the standing issue and to the remaining issues raised by Defendant's Motion by January 30, 2015.  The Clerk is **DIRECTED** to exclude from computation under the Speedy Trial Act, the period of delay from the date of this Order to January 30, 2015, pursuant to 18 U.S.C. § 3161(h)(1)(D).

## **CONCLUSION**

Based on the foregoing reasons, this Court **RECOMMENDS** that Defendant's Motions to Suppress Identifications be **DENIED**.  Docket Entries [17, 23, 61]. Additionally, the parties are **ORDERED** to more fully brief Defendant's Motions to Suppress Evidence Resulting from Unlawful Search Warrants as indicated herein.

Docket Entries [18, 59].  Furthermore, Defendant's Motion for Additional Time to Perfect Motion to Suppress In-Court Identifications Based on Suggestive Out-of-Court Identification Procedures by Government Witness Docket and Defendant's Motion and Defendant's Motion for Additional Time to File Reply Brief are **GRANTED** Nunc Pro Tunc.  Docket Entries [22, 63].  Finally, the Government's Motion for Reconsideration and Clarification is **DEEMED MOOT**.  Docket Entry [46].

**SO ORDERED, REPORTED AND RECOMMENDED** this __30th__ day of December, 2014.


/s/Linda T. Walker_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

25

AO 72A
(Rev.8/82)